UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOANN RAO,

                          Plaintiff,

     -v-                                         5:12-CV-1459

LIFE INSURANCE COMPANY OF
NORTH AMERICA,

                          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

SATTER LAW FIRM, PLLC                     SARAH E. RUHLEN, ESQ.
Attorneys for Plaintiff
217 South Salina Street, 6th Floor
Syracuse, NY 13202

RUSSO, KEANE LAW FIRM                     KEVIN G. HORBATIUK, ESQ.
Attorneys for Defendant
33 Whitehall Street, 16th Floor
New York, NY 10004


DAVID N. HURD
United States District Judge

**MEMORANDUM–DECISION and ORDER**

## I. INTRODUCTION

Plaintiff Joann Rao ("Rao" or "plaintiff") filed this action pursuant to the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq*., alleging, inter alia,

that she was wrongfully denied short- and long-term disability benefits by defendant E.C.

Barton & Co. Disability Plan (the "Disability Plan"), a benefits plan offered by her former

employer, defendant E.C. Barton & Co., Inc. ("E.C. Barton"), and underwritten by defendant

Life Insurance Company of North America ("LINA").  After the parties stipulated that LINA would be the sole party liable to plaintiff for any successful benefits claims, E.C. Barton and the Disability Plan were dismissed from the action.  Thereafter, plaintiff and LINA, the sole remaining defendant, cross-moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  The motions have been fully briefed and were considered without oral argument.

## II.  BACKGROUND

The following chronology of Rao's medical treatment as well as her applications for, and appeals from denials of, benefits under the disability policies at issue is derived from an independent review of the administrative record and the parties' various submissions. However, given the voluminous nature of this material, the parties' respective statements of material facts have been utilized to assist in identifying the relevant documents to be addressed.[1]

Rao worked as the Head Cashier at one of E.C. Barton's Bargain Outlet stores until February 16, 2011, when she left work to care for her husband under the Family Medical Leave Act ("FMLA").  See Pl.'s Statement of Material Facts, ECF No. 29-8, ¶ 16 ("Pl.'s Rule 7.1 Stat.").  The parties agree that, as of the date this FMLA leave began, plaintiff was a covered participant of both short- and long-term disability insurance policies offered by E.C. Barton and underwritten by LINA.  Id. ¶¶ 1, 16; Def.'s Statement of Material Facts, ECF No. 31-2, ¶ 1 ("Def.'s Rule 7.1 Stat.").

---

[1] Facts cited from either party's Statement of Material Facts have been admitted by the opposing party in corresponding paragraphs of the response to same.

On April 28, 2011, Rao, still on FMLA leave to care for her husband, visited John Cambareri, M.D., of Syracuse Orthopedic Specialists, complaining of pain in her cervical spine that had been present for "quite awhile" but had been "growing worse in the last few months."  AR at 696-99.[2]  In particular, plaintiff told Dr. Cambareri that she had been suffering from this pain for approximately two to three years but that, in general, "the progression of the problem seem[ed] to be getting worse."  Id. at 696.  Plaintiff explained to Dr. Cambareri that the pain was located along her "whole right side," radiating from her neck into her right shoulder, arm, and elbow.  Id. at 696-97.

Dr. Cambareri's exam of Rao's neck revealed tenderness to palpation of the right para-vertebral muscles; tenderness over the musculature adjacent to the right scapula; a spasm in the mild right para-vertebral muscles; abnormal bilateral sensation; a moderate "global loss" to the range of motion of plaintiff's neck; and pain at the "extremes of motion."  Id. at 698.

Dr. Cambareri's exam of Rao's right shoulder likewise revealed that she was "positive" for both the Hawkins and Neer Impingement Signs and that she suffered tenderness to palpation that was present at the anterior joint line.  AR at 698.  Dr. Cambareri also noted a "global loss" to plaintiff's range of motion in her right shoulder that included pain at the extremes of movement.  Id.  However, Dr. Cambareri also recorded plaintiff's gait as normal and noted that there were no signs of instability or deformity in her cervical spine.  Id.

Ultimately, Dr. Cambareri concluded Rao had neck pain which he believed was primarily due to "cervical radiculopathy" and secondarily due to "right rotator cuff tendinitis or

---

[2]  The citations to the administrative record ("AR at ____"), which omit any leading zeroes, correspond to the bates-stamped documents filed by LINA.  See Horbatiuk Decl., ECF No. 31-1, ¶ 8 (referencing Exhibit A to Affidavit of Richard Lodi).

impingement." AR at 699. Noting that plaintiff has "had [this problem] for almost six years now" and "has been to [physical therapy] in the past," Dr. Cambareri recommended an MRI imaging study of her cervical spine. Id. However, he did not comment on plaintiff's fitness to return to work because he noted she was already out on FMLA leave at the time of her visit. Id.

On May 3, 2011, Rao underwent the recommended MRI imaging study of her cervical spine. AR at 743. The results of this study revealed a central disc herniation at C3-C4 causing "mild flattening of the ventral margin of the cervical cord"; a central disc herniation at C6-C7 causing an indent to "the ventral margin of the thecal sac"; a para-central disc herniation at C4-C5 causing "right lateral recess stenosis"; "severe right neural foraminal stenosis"; and "right uncovertebral hypertrophic changes" at C4-C5. Id.

The very next day, May 4, 2011, Dr. Cambareri discussed the results of this MRI imaging study with Rao via telephone. AR at 663. Dr. Cambareri explained to plaintiff that she suffered from three herniated discs in her neck and that her treatment options ranged from "nothing to physical therapy to nerve blocks to surgery." Id. Since plaintiff "just couldn't make up her mind what to do," Dr. Cambareri instructed her to call his office "if she decides to either pursue physical therapy and nerve block or pursue a surgical opinion" with one of his associates at the medical practice. Id.

On May 12, 2011, Rao first submitted paperwork to her employer claiming a spinal disability under E.C. Barton's short-term disability policy. Pl.'s Rule 7.1 Stat. ¶ 17. While she awaited a response from the policy claims department, Dr. Cambareri issued plaintiff a doctor's note dated May 13, 2011 indicating she would be "out of work until the next visit or until further notice, until 5/18/11." AR at 662.

On May 18, 2011, Thomas Haher, M.D., also of Syracuse Orthopedic Specialists, examined Rao. AR at 659-61. At this visit, plaintiff complained of pain at a different location—in her lower back and the right side of her hip. Id. at 659. Dr. Haher's exam revealed mostly normal results. Id. at 660-61. Notably, Dr. Haher concluded plaintiff had a full range of motion with no pain, tenderness, or deformity of her cervical spine. Id. at 660. However, Dr. Haher also reviewed plaintiff's MRI images, noting that they showed "evidence of disk disease, most prominently at C4-5 on the right." Id. Ultimately, Dr. Haher assessed plaintiff as suffering from a herniated cervical disk without myelopathy. Id. Dr. Haher issued a note indicating plaintiff was under a "TOTAL DISABILITY - Until next visit or further notice." Id. at 658, 661.

On May 23, 2011, Rao checked in with Dennis Daly, M.D., her primary care provider. AR at 596-99. A physical exam completed that day also revealed mostly normal results, but included assessments for unspecified backache and an inter-vertebral cervical disc displacement without myelopathy. Id. at 597-98. Dr. Daly's report also noted that plaintiff's depressive disorder, which she had suffered from in the past, had recurred. Id. Finally, Dr. Daly noted that plaintiff's MRI results showed "multi level disc problems with fecal encroachment" and indicated his belief that plaintiff would be a good candidate for injection therapy. Id. at 598.

## A. LINA Considers Rao's Claim

On May 24, 2011, LINA received the documents Rao had submitted earlier that month and opened a primary claim file to begin gathering information about her claim for benefits

under E.C. Barton's short-term disability policy.[3]  AR at 3, 105-11.  The LINA claim file

indicates that plaintiff alleged disability stemming from three herniated discs, bone spurs, and

osteoporosis in her spine.  Id. at 107-08.  This claim file also indicates that plaintiff's "incurred

date," the date used by LINA for calculating the beginning of a period of alleged disability,

was April 28, 2011.  Id. at 105.  LINA's records also indicate that one of its claim managers

sent forms to plaintiff's treating doctors requesting information to assist in making a

determination about plaintiff's eligibility for STD Policy benefits.  See, e.g., AR at 657.

While LINA was in the process of collecting this information, Rao's medical treatment

continued.  On June 1, 2011, Dr. Haher completed an FMLA medical certification which

indicated that plaintiff was being referred for a pain management consultation at the New

York Spine and Wellness Center.  AR at 601.  This certification also stated that plaintiff was

under a "total temporary disability until next visit or further notice."  Id. at 600.  Dr. Haher's

certification further indicated that plaintiff's disabling condition began on approximately April

28, 2011, and would likely continue until at least July 28, 2011.  Id.

On June 7, 2011, Rao received a pain management consultation at the New York

Spine and Wellness Center.  AR at 636-38.  A treatment note signed by both Physician's

Assistant Anne Marie Arendt and Mary C. Trusilo, M.D. again indicated that plaintiff suffered

from certain spinal maladies:  cervical stenosis, cervical "HNYP," and low back pain.  Id. at

637.  This treatment record also noted plaintiff had a Beck Depression Index Score of 29/63,

which is indicative of "a severe reactive depression."  Id.  Finally, this treatment note

indicated plaintiff would be undergoing a "right cervical transforaminal nerve block" procedure

---

[3]  Rao was a covered participant of Group Short Term Disability Insurance Policy No. LK-750709 (the "STD Policy").  See, e.g., Def.'s Rule 7.1 Stat. ¶ 1.  LINA is named as the fiduciary responsible for deciding benefits claims and appeals under this policy.  Id. ¶ 2.

that would target her C4-C5 vertebrae and that plaintiff was expected to follow-up in the office after this procedure.  Id. at 638.  Three days later, on June 10, 2011, the New York Spine and Wellness Center issued an "out of work" slip indicating plaintiff would be removed from work for three months, at which time she would be re-evaluated.  Id. at 640.

On June 16, 2011, Rao underwent another MRI imaging study, this time of her lumbar spine.  AR at 748.  This scan revealed a broad-based central-left para-central disc protrusion at L5-S1 with "mild mass effect upon the thecal sac" but with "no canal stenosis or nerve root compression."  Id.  This scan also revealed "mild degenerative changes of the lower lumbar spine."  Id.

On July 19, 2011, Robert L. Tiso, M.D., also of New York Spine and Wellness Center, performed a nerve block procedure on Rao at the C4-5 level.  AR at 641.  Plaintiff followed up with Dr. Daly on July 29, 2011, who noted in his treatment records that plaintiff continued to have "very limited [range of motion] of [her] neck, [and of her] lumbar spine."  Id. at 503-04.  Although he did note that plaintiff was currently receiving injection therapy, Dr. Daly indicated he was "really not sure how well she is going to do."  Id. at 504.  Dr. Daly assessed plaintiff as continuing to suffer from inter-vertebral cervical disc displacement without myelopathy as well as a depressive disorder.  Id.

### B.  LINA Denies Benefits

Ultimately, both Dr. Haher and Dr. Daly responded to LINA's requests for information to assist in evaluating Rao's initial disability claim.  Dr. Haher's response indicated plaintiff suffered from a "total tem[porary] disability" and that she had been referred to the New York Spine and Wellness Center for pain management.  AR at 656.  In particular, Dr. Haher noted that plaintiff suffered from "disk disease, most prominent at C4-5 on the right."  Id.  Similarly,

Dr. Daly's response to LINA indicated plaintiff suffered from "severe back pain with radiation to [her] legs" that occurs while walking, standing, and sitting.  Id. at 676.  Dr. Daly further indicated plaintiff is "unable to sit/stand for more than 20 - 30 minutes at one time and has continuous pain while doing so."  Id. at 675.

On July 27, 2011, LINA denied Rao's claim for benefits under the STD Policy.  AR at 143-45.  The letter memorializing this denial indicates that it included a consideration of:  (1) the May 3, 2011 MRI report; (2) an April 28, 2011 office note from Dr. Cambareri; and (3) a May 18, 2011 office note from Dr. Haher.  Id. at 143.  This denial letter concluded that, despite this information from her physicians, "[t]here [were] no physical deficits noted that indicated you could not perform you[r] job as a Cashier."  Id. at 144.

### C. Rao Appeals

Rao filed a timely administrative appeal of this denial.  Pl.'s Rule 7.1 Stat. ¶ 60. Pending the outcome of her appeal, plaintiff's medical treatment continued.[4]  On August 23, 2011, Dr. Daly completed a "Return to Work Capabilities Form" on plaintiff's behalf.  AR at 645.  This form indicated plaintiff could only sit, stand, or work for less than one hour in an entire eight-hour work day; was unable to lift or carry even ten pounds; was totally unable to crawl, kneel, or twist; and suffered impaired use of her right hand.  Id.  Dr. Daly's form also indicated plaintiff was currently unable to work, but that these restrictions would expire on approximately September 30, 2011.  Id.

---

[4]  On August 17, 2011, Dr. Cambareri added an addendum to his April 28, 2011 office note to state that he was "going to consider her totally disabled from 4/28/11 until she sees Dr. Haher on 5/18/11."  AR at 478-79.

On September 1, 2011, Dr. Tiso again performed a nerve block procedure on Rao, this time targeting both the C4-5 and C5-6 levels.  AR at 480.  However, Dr. Tiso's procedure records indicate plaintiff received "no relief" as to her C4-5 level and included a note indicating she was still unable to lift more than ten pounds; maintain a single position for a prolonged period of time; or do any bending or overhead reaching at that time.  Id. at 480, 624.

On September 8, 2011, Anil Verma, M.D., of Psychiatric Wellness Care, conducted a mental health exam on Rao.  AR at 487-88.  Dr. Verma's exam notes indicate plaintiff was "highly distractible to the point of having an impact on daily functioning" and that her "motivation for treatment appears to be higher than average."  Id. at 488.  Dr. Verma diagnosed plaintiff with "bipolar I disorder - mixed."  Id.

On September 22, 2011, Dr. Verma provided a doctor's note which indicated Rao was completely unable to work until at least October 21, 2011 because of severe depression stemming from her bipolar disorder.  AR at 613.  Plaintiff continued to treat with Dr. Verma during this time period.  See id. at 486-88.

On October 4, 2011, Stephen P. Jacobson, M.D., LINA's Medical Director, reviewed Rao's medical documentation as part of her appeal.  AR at 581-83.  Dr. Jacobson reviewed all of the medical documentation already discussed and current through July 19, 2011, including imaging studies and  treatment notes from Dr. Cambareri, Dr. Haher, Dr. Daly, and Dr. Trusilo.  Id.  Dr. Jacobson concluded that:  (1) the diagnostic studies, such as the MRI studies of plaintiff's cervical and lumbar spine, did not suffice to support or deny the presence of an impairment because these studies failed to offer any quantitative analysis of the degree of plaintiff's disability; and (2) plaintiff's mere diagnoses, such as references to her "herniated

disc, radiculopathy, and osteopenia," were not *per se* evidence of any physical deficits because "the mere label of a condition" also failed to quantify the degree of any alleged disability.  Id.  In sum, Dr. Jacobson concluded plaintiff was not disabled because her medical records did not document measured physical deficits to support continuous limitations from her incurred date to the date of his report.  Id. at 583.

### D.  LINA Denies Rao's Appeal

On October 6, 2011, LINA, relying heavily on Dr. Jacobson's conclusions, denied Rao's appeal.  AR at 577-80.  This denial cautioned plaintiff that "pathology alone does not necessarily equate to a disabling condition," and concluded that the medical records "contain[ed] no findings of functional deficits documented through findings of any significant decreased range of motion by inclinometer or goniometer, instability, or significant strength impairments to indicate a severity of impairment that would preclude [plaintiff] from [her] medium duties as a head cashier as of April 28, 2011."  Id. at 579-80.

Rao weighed her options and continued to receive medical treatment for her conditions.  For instance, on November 1, 2011, a treatment note signed by both PA Arendt and Dr. Trusilo indicates plaintiff again visited the New York Spine and Wellness Center for a physical checkup.  AR at 494-95.  This exam indicated plaintiff had an antalgic gait, a palpable trigger point on the right levator scapula, and trapezius tenderness.  Id. at 495.  This exam also indicated that further nerve block injections were being deferred as the first two attempts had provided only "minimal relief."  Id.  Finally, this exam concluded plaintiff should continue to be restricted from lifting anything greater than ten pounds; from maintaining any prolonged position; from reaching overhead; and from doing any bending.  Id.

- 10 -

### E. Rao's Second Appeal

On November 20, 2011, Rao's counsel wrote to Susan Heliker, an LINA appeal claim manager, indicating his intent to file a second appeal of plaintiff's denial of STD Policy benefits.  AR at 524.  This letter included a request for a copy of plaintiff's current claim file as well as "a copy of the insurance policy and/or summary plan description" applicable to plaintiff.  Id.  This letter also stated that, "[b]y this letter, please understand that in addition to appealing the denial of her claim for [STD Policy] benefits, [plaintiff] also is asserting a claim for long term disability benefits" and requested that Ms. Heliker inform counsel of "anything further" plaintiff needed to do "to provide notice of her claim" for long term benefits.[5]  Id.

At the behest of Rao's counsel, Dr. Verma swore to an affidavit summarizing his treatment of Rao.  AR at 469-70.  Dr. Verma opined that, as a result of her bipolar disorder, plaintiff is often unable to effectively focus even on simple tasks; is unable to deal with routine life stressors; and "is totally overwhelmed even without having to cope with employment."  Id. at 470.  Dr. Verma further indicated that an attempt to "return even to a simple, low stress position would certainly cause an aggravation of her symptoms."  Id. Finally, Dr. Verma indicated that, given "the degree and persistence of her psychiatric symptoms, [he does] not think she will be ready to return to work at any point in the foreseeable future."  Id.

Likewise, Dr. Haher swore to an affidavit summarizing his treatment of Rao.  AR at 465-67.  Dr. Haher opined that, as a result of her spine problems, plaintiff is "unable to sit for

---

[5]  Rao was also a covered participant of Group Long Term Disability Insurance Policy No. VDT-960498 (the "LTD Policy").  Pl.'s Rule 7.1 Stat. ¶ 16; see also Andrews Aff., Ex. 1, ECF No. 29-2, 1-34 (the "LTD Policy Text").  This policy also names LINA as the fiduciary responsible for deciding benefits claims as well as appeals of denied claims.  See, e.g., Stipulation and Order of Dismissal, ECF No. 18, ¶ 5.

more than 30 minutes at a time and would not be able to sit for 4 hours in an 8 hour work day" and "is also limited to standing and walking about 10 minutes at a time and would be unable to stand and walk even for 2 hours in an 8 hour work day." Id. at 467.  Dr. Haher further opined that although plaintiff "can lift very light items, weighing less than 3 pounds, with her right hand," she "often drops even light items being held in her right hand." Id. Similarly, Dr. Haher opined that although plaintiff "can lift items weighing less than 10 pounds occasionally with her left hand," she "could not perform repetitive lifting at any weight" or, for that matter, perform "any repetitive activity, such as typing." Id.  Dr. Haher also indicated plaintiff "cannot engage in overhead reaching, bending, stopping, kneeling, or climbing." Id. Finally, Dr. Haher indicated that, in his medical opinion, plaintiff has been disabled from working since at least April 2011 and would be unable to perform even sedentary, part-time work.  Id.

On February 6, 2012, Rao's counsel submitted a second appeal to LINA on her behalf.  AR at 460-64.  In addition to the new affidavits from Dr. Haher and Dr. Verma, plaintiff's appeal also included additional treatment records from Dr. Haher, Dr. Verma, PA Arendt, and Dr. Trusilo.  Id. at 460.  Finally, although the appeal letter only indicated that it was submitted "relative to" policy number LK0750709 (the STD Policy), it again mentioned that the information was also being submitted "in support of [plaintiff's] claim for long term disability benefits."  Id.

### F. Rao Files Suit in Federal Court

On March 5, 2012, LINA denied Rao's second appeal.  AR at 457-58.  This denial again indicated that "the medical records contained on file do not provide supportive time-concurrent documentation of a physical impairment and a global psychiatric impairment

that would continuously preclude [plaintiff's] ability to perform the material duties of her job from April 28, 2011 forward." Id. at 458; Pl.'s Rule 7.1 Stat. ¶ 74. Plaintiff, having exhausted all of her options for administratively appealing LINA's continued denials of STD Policy benefits, filed this suit in federal court.

## III. **LEGAL STANDARDS**

### A. **Summary Judgment**

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). Such a fact is genuinely in dispute only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Under this standard, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4. Once this initial burden is met, the opposing party must show, through affidavits or otherwise, that a material issue of fact remains for trial. Id. at 250.

Importantly, a court considering a motion for summary judgment "cannot try issues of fact; it can only determine whether there are issues to be tried." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36-37 (2d Cir. 1994) (citations omitted). In making this determination, a court resolves any ambiguities or inferences to be made from the facts in a

light most favorable to the non-moving party.  <u>Jeffreys</u>, 426 F.3d at 553.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50.  Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." <u>Id</u>. at 247-48 (emphasis in original).  However, summary judgment is appropriately denied where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002) (citations omitted).

### B.  Employee Retirement Income Security Act

"A beneficiary of an ERISA plan may bring a civil action 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." <u>Barbu v. Life Ins. Co. of N. Am.</u>, 35 F. Supp. 3d 274, 280 (E.D.N.Y. 2014) (quoting 29 U.S.C. § 1132(a)(1)(B)).  Although "ERISA itself does not define the standard of review applicable to such actions," <u>Zuckerbrod v. Phoenix Mut. Life Ins. Co.</u>, 78 F.3d 46, 49 (2d Cir. 1996), the U.S. Supreme Court has made clear that *de novo* review is the presumptive standard "unless the plan provides to the contrary." <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 111 (2008) (quoting <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989)).

## IV.  DISCUSSION

This case reveals a number of serious disagreements between the parties, both in the standards of review to be applied to Rao's claims and whether, and even to what extent, any benefits may be payable to her.  As an initial matter, however, the parties must be reminded of the limitations of summary judgment.  Although Rao and LINA nominally titled their

respective motions in this manner, their submissions appear to invite resolution of the central factual disputes—for example, whether plaintiff was "disabled" within the meaning of either the short- or long-term disability plans underwritten by LINA.

But "[t]he district court's task on a summary judgment motion—even in a nonjury case—is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011). This type of confusion about the contours of a district court's review on a summary judgment motion is not novel, at least in ERISA cases. Indeed, parties to ERISA cases often make a "motion for judgment on the administrative record," which, as the Second Circuit has observed, is "a motion that does not appear to be authorized in the Federal Rules of Civil Procedure." O'Hara, 642 F.3d at 116 (citation omitted). Historically, courts have treated such motions as requesting "essentially a bench trial on the papers with the District Court acting as the finder of fact." Id. (citation and internal quotation marks omitted).

However, the Second Circuit has recently made clear that "the parties must expressly consent to a 'bench trial on the papers' if they intend for the district court to resolve factual disputes." Barbu, 35 F. Supp. 3d at 279 (citing O'Hara, 642 F.3d at 116). Because the parties have not clearly indicated their intent to consent to such a procedure, the well-established summary judgment standard will be applied to each party's motion.[6]

### A. **STD Policy Benefits**

Under this plan, an employee is eligible for STD benefits "if, solely because of Injury or Sickness, he or she is: (1) unable to perform the material duties of his or her Regular Job;

---

[6] For example, the parties could have stipulated to a "bench trial on the papers" pursuant to Rule 52. See Barbu, 35 F. Supp. 3d at 280.

and (2) unable to earn 80% or more of his or her Covered Earnings from working in his or her Regular Job."  AR at 435.  As relevant here, the STD Policy defines "Sickness" as "any physical or mental illness."  Id. at 450.  The plan further indicates that, in determining whether the employee can perform the material duties of his or her Regular Job, LINA will "consider the duties of the job as it is normally performed for the Employer."  Id.

Accordingly, an employee who is determined to be continuously unable to perform the material duties of his or her Regular Job as it is "normally performed" for her employer may receive STD Policy benefits for roughly twenty-five weeks provided he or she:  (1) first satisfies a seven-day "elimination" period; (2) remains under the "appropriate care" of a physician; (3) submits satisfactory proof of continued disability; and (4) is able to meet all other terms and conditions of the policy.  AR at 435-36, 441.

LINA concluded that Rao's "Regular Job" as Head Cashier at E.C. Barton required her to perform "medium" demand activities as defined by the Dictionary of Occupational Titles ("DOT"), which include exerting twenty to fifty pounds of force occasionally, or ten to twenty-five pounds of force frequently, or up to ten pounds of force constantly.  See, e.g., AR at 457.  Specifically, plaintiff's position required her to lift, bend, stand, and walk eight hours a day, five days a week.  Id. at 634.

Rao argues there is "overwhelming evidence" that she has been totally, continuously disabled within the meaning of this STD Policy since April 28, 2011 and claims virtually every physician who took part in her care found her to be totally disabled from this incurred date

until the final evidence was gathered for her second appeal in 2012.  Pl.'s Mem. Supp.

Summ. J., ECF No. 29-6, 19 ("Pl.'s Mem.").[7]

LINA's motion, as well as its response in opposition, essentially asserts that the

voluminous medical evidence Rao identifies is not the "satisfactory proof" required by the

STD Policy.  In particular, LINA claims "[t]here is no objective medical evidence in the

administrative record that supports a finding" plaintiff is disabled.  Def.'s Mem. Supp. Summ.

J., ECF No. 31-3, 16 ("Def.'s Mem.").

The parties agree that a *de novo* standard of review applies to Rao's claim for STD

Policy benefits.  Pl.'s Mem. at 17; Def.'s Mem. at 13-14.  "[U]pon *de novo* review, a district

court may render a determination on a claim without deferring to an administrator's

evaluation of the evidence."  Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 296 (2d Cir.

2004).  Under this standard, the claimant bears the burden of proving by a preponderance of

the evidence that she is disabled within the meaning of the plan.  See, e.g., Kagan v. Unum

Provident, 775 F. Supp. 2d 659, 671 (S.D.N.Y. 2011).  In light of the parties' agreement on

this issue, as well as the fact that an independent review of the STD Policy reveals no

language to indicate a reservation of discretion to LINA, the *de novo* standard of review will

apply to plaintiff's claim for short-term disability benefits.

A careful review of the evidence in the administrative record confirms that Rao's

treating physicians are unified as the disabling nature of her condition.  In fact, these

physicians were able to repeatedly conclude, at various points, that she was so disabled as

to be precluded from even the demands of "medium" work as that term is defined in the

---

[7]  Pagination corresponds to that assigned by CM/ECF.

DOT.  For instance, Dr. Cambareri, a physician with Syracuse Orthopedic Specialists who

examined plaintiff on April 28, 2011, noted that she suffered from numerous points of

tenderness on a physical exam as well as a moderate "global loss" to certain aspects of her

range of motion even though her gait was normal and she lacked obvious instability or

deformity in her cervical spine.  AR at 698.  On this basis, Dr. Cambareri issued a note

indicating he would consider plaintiff disabled from May 13, 2011 until she met with Dr.

Haher, one of his colleagues at the medical practice.  Id. at 479.  Dr. Cambareri also later

added an addendum to his treatment record noting he considered Rao completely disabled

as of April 28, 2011.  Id. at 478-79.

Similarly, Dr. Haher, whom Rao then visited on May 18, 2011, also concluded plaintiff

suffered from a "TOTAL DISABILITY" beginning on at least that date.  AR at 658-61.  Unlike

Dr. Cambareri, Dr. Haher conducted his physical exam with the additional benefit of objective

medical evidence—MRI images documenting findings of various deformities.  Id.  A medical

certification Dr. Haher later completed on plaintiff's behalf indicated his belief that her

disabling condition also began on approximately April 28, 2011.  Id. at 600.

In addition, Dr. Daly's August 23, 2011 Return to Work Capabilities Form indicated

Rao was unable to lift or carry even ten pounds and was unable to work at that time.  AR at

645.  Likewise, Dr. Tiso's September 1, 2011 out-of-work note sets forth work restrictions that

would appear to be inconsistent with the "medium" demands required of a Head Cashier.

See id. at 624 (indicating plaintiff could only lift less than ten pounds and was precluded from

maintaining any single position for a prolonged period).  Finally, a November 1, 2011

treatment record from New York Spine and Wellness Center indicates plaintiff was still

restricted from lifting greater than ten pounds; maintaining any prolonged positions; or doing any overhead reaching or bending due to her "cervical disc herniation."  Id. at 495.

In contrast, LINA relies only on the assessment of Dr. Jacobson, who reviewed Rao's medical records and concluded that "the medical records reviewed do not provide documentation of significant quantified measured deficits to support continuous limitations for non-mental health conditions from 4/28/11 to date of this report."  AR at 582.

However, as LINA notes in its own moving papers, Dr. Jacobson appears to have discounted the opinions of plaintiff's various treating physicians on the basis of perceived deficiencies in their medical records rather than on the basis of any genuine medical determination.  For instance, Dr. Jacobson notes that Dr. Haher's May 18, 2011 exam did not occur until "several weeks" after plaintiff's April 28, 2011 incurred date.  AR at 582.  Likewise, Dr. Jacobson discounted plaintiff's MRI imaging studies for their respective failures to "quantify" the degrees of resulting impairment.  Id. at 583.

Indeed, rather than even attempt to rebut any of the affirmative findings of Rao's various treating physicians, Dr. Jacobson's analysis, and LINA's subsequent denial of benefits, is apparently based solely on a lack of "time concurrent" medical evidence and the alleged failure of plaintiff's various physicians to perform certain methods of testing—requirements not found in the STD Policy.  Barbu, 35 F. Supp. 3d at 278 ("The Court is not persuaded by defendant's arguments concerning 'time concurrent' evidence, because the Policy contains no requirement that records be 'time concurrent,' nor does it require that particular tests be performed.").

LINA further argues it was under no duty to accord any special weight to the opinions of Rao's various treating physicians and suggests that those physicians were only able to

reach their diagnoses "based on their acceptance of her subjective complaints."  Def.'s Mem. at 19.  But although LINA is correct to argue that a treating physician is not automatically afforded any "special weight" in the disability determination, this is not a license to arbitrarily ignore credible medical evidence simply because it comes from a claimant's treating source.  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833-34 (2003); Paese v. Hartford Life & Acc. Ins. Co., 449 F.3d 435, 442 (2d Cir. 2006).

In sum, no reasonable fact finder could conclude that Rao is not disabled as that term is defined by the STD Policy.  Plaintiff has easily carried her burden of proving, by a preponderance of the evidence, that she is disabled within the meaning of the STD Policy.  LINA's attempt to manufacture a factual dispute by relying on the lone dissenting opinion of Dr. Jacobson, especially when that dissent is based on standards not found in the terms of the STD Policy, is insufficient.[8]  Accordingly, plaintiff's motion for summary judgment with respect to her claim for STD Policy benefits will be granted.

### B.  LTD Policy Benefits

Under this plan, an employee is eligible for LTD benefits "if, solely because of Injury or Sickness, [he or she is]:  (1) unable to perform the material duties of [his or her] Regular Occupation; and (2) unable to earn 80% or more of [his or her] Indexed Earnings from working in your Regular Occupation."  LTD Policy Text at 26.  As relevant here, the LTD Policy defines "Sickness" as "a physical or mental illness."  Id. at 27.  The plan further indicates that a claimant's "Regular Occupation" is the occupation "you routinely perform at the time the Disability begins" and will be determined by reference to how "it is normally

---

[8]  It is undisputed fact that Dr. Jacobson is the only physician to ever review Rao's claim on LINA's behalf.  Pl.'s Rule 7.1 Stat. ¶ 63

performed in the general labor market in the national economy" as opposed to "work tasks that are performed for a specific employer or at a specific location."  Id.

Accordingly, an employee who is determined to be continuously unable to perform the material duties of his or her Regular Occupation as it is "normally performed" in the general labor market may receive LTD Policy benefits for roughly twenty-four months provided he or she:  (1) first satisfies a 180-day "elimination" period; (2) remains under the "appropriate care" of a physician; (3) submits satisfactory proof of continued disability; and (4) is able to meet all other terms and conditions of the policy.  LTD Policy Text at 17.

However, after benefits have been payable under the LTD Policy for twenty-four months, the plan's definition of disability changes.  See LTD Policy Text at 26.  Specifically, a claimant will only be considered disabled during that period if he or she is:  (1) unable to perform the material duties "of any occupation" for which she "is, or may reasonably become, qualified based on education, training or experience"; and (2) unable to earn 60% or more of his or her Indexed Earnings.  Id.

But this shifting definition of disability is only one reason that Rao's claim for LTD Policy benefits is more problematic.  In fact, not only do the parties dispute the standard of review applicable to this policy, but LINA also maintains that plaintiff never even submitted a valid claim for benefits in the first instance.  Compare Pl.'s Mem. at 26, with Def.'s Mem. Opp'n Summ. J., ECF No. 35, 9-12, 16 ("Def.'s Mem. Opp'n").

### 1.  Standard of Review

"[W]here the ERISA plan confers upon the plan administrator discretionary authority to 'construe the terms of the plan,' the district court should review a decision by the plan administrator under an excess of allowable discretion standard."  Magin v. Cellco P'ship, 661

F. Supp. 2d 206, 213 (N.D.N.Y. 2009) (Suddaby, J.) (quoting Frommert v. Conkright, 535 F.3d 111, 119 (2d Cir. 2008)).  Under this "highly deferential standard of review," a plan administrator's decision "should only be disturbed if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." Id. (citation omitted).

The LTD Policy in this case states that LINA has "the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact." LTD Policy Text at 29.  This language is precisely the type of grant of discretionary authority that would ordinarily direct a district court to limit its review to an "excess of allowable discretion" standard.

Rao concedes as much in her moving papers, but nevertheless argues *de novo* review is appropriate in this case because of LINA's lack of action on her LTD Policy claim.  Pl.'s Mem. at 26.  Specifically, plaintiff asserts that where "a decision maker misses the deadlines set forth in the pertinent federal regulations," ERISA provides that a claim may be "deemed denied" and a district court may conduct a *de novo* review.  Id.

LINA makes a twofold response to Rao's assertion.  First, LINA argues plaintiff fails to note the effect of an intervening change in ERISA regulations that removed the language stating a violation of regulatory deadlines will result in a claim being "deemed denied."  Def.'s Mem. Opp'n at 10.  Second, LINA asserts it has not violated any regulatory deadlines because it neither received, nor ever ultimately denied, any acceptable notice of claim for LTD Policy benefits.  Id. at 12.

A review of ERISA case law reveals that the parties' dispute over the applicable standard of review in this scenario is a legitimate one.  Prior ERISA regulations provided that, "[i]f a decision on review is not furnished within [the specified period of time], the claim shall

be <u>deemed denied</u> on review." 29 C.F.R. § 2560.503-1(h)(4) (1999) (emphasis added). The Second Circuit, interpreting this language in 2005, concluded that these "deemed denied" claims are subject to *de novo* review. <u>See</u> <u>Nichols v. Prudential Ins. Co. of Am.</u>, 406 F.3d 98, 109 (2d Cir. 2005) (concluding a carrier's lack of a "valid exercise" of discretion warranted *de novo* review).

However, subsequent amendments to ERISA's regulations have removed the "deemed denied" language and instead phrase the claimant's remedy for a tardy response from a claim administrator in slightly different terms. <u>See</u> 29 C.F.R. § 2560.503-1(l) (2013) ("In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to [bring a civil action] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim."). In other words, current ERISA regulations seem to "take no position on whether a claim is approved or denied upon the expiration of the regulatory time period and, therefore, do not terminate an administrator's authority to exercise its discretion." <u>Wedge v. Shawmut Design & Const. Grp. Long Term Disability Ins. Plan</u>, No. 12 Civ. 5645(KPF), 2013 WL 4860157, at * 7 (S.D.N.Y. Sept. 10, 3013).

Indeed, several Second Circuit decisions have recently indicated that it is still an open question whether *de novo* review still applies to a plan that otherwise vests the administrator with discretion. <u>See, e.g.</u>, <u>Krauss v. Oxford Health Plans, Inc.</u>, 517 F.3d 614, 624 (2d Cir. 2008) ("Although amended regulations have replaced the 'deemed denied' provision with one that, upon a defendant's failure to follow regulatory time frames, deems a plaintiff's administrative remedies exhausted, and neither we nor any other circuit has, to our

knowledge, addressed whether *de novo* review similarly applies under the revised regulations, we join our sister circuits in delaying resolution of the question for another day." (internal citation omitted)).  And the U.S. Supreme Court has recently cast doubt on the continued vitality of Nichols, rejecting the Second Circuit's decision to apply *de novo* review in an unrelated case where the plan administrator had previously construed the terms of the plan in a manner that violated ERISA.  See Conkright v. Frommert, 559 U.S. 506, 513 (2010) (rejecting a "one-strike-and-you're-out" approach to review of a plan administrator's denial of benefits).  In light of these doctrinal developments, as well as the clear grant of discretion contained in the LTD Policy, Rao's claim for LTD Policy benefits should be reviewed under the more deferential arbitrary and capricious standard.

### 2. **Remand**

Here, the parties agree that LINA never made any response to Rao's counsel's assertions, made in various letters he submitted to LINA during the appeal process, that she was also seeking payment of LTD Policy benefits.  See Pl.'s Rule 7.1 Stat. ¶ 77.  In essence, then, plaintiff's claim is that LINA mishandled her claim by failing to respond adequately to her counsel's various requests, denying her "the full and fair review" to which she is entitled.  "A full and fair review concerns a beneficiary's procedural rights, for which the typical remedy is remand" for proper review in the first instance.  Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 630 (2d Cir. 2008).

Rao agrees that her long-term benefits claim should be remanded for consideration of whether she meets the "any occupation" disability standard that applies after twenty-four months have passed.  See Pl.'s Reply Mem., ECF No. 39, 13.  However, she also claims that, because the disability standard for the initial twenty-four month period for long-term

benefits eligibility is substantially similar to the showing required for STD Policy benefits, a grant of long-term benefits is nevertheless proper.

Even though the two plan definitions do appear to be similar, Rao's entire LTD benefits claim must be remanded so that LINA may first render a decision.  Indeed, reviewing this claim without reference to any underlying decision by LINA would essentially amount to a *de novo* determination by this Court rather than an "arbitrary and capricious" review of the actions of the plan administrator.  But "[n]othing in [ERISA's] legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators."  Gregory v. Metro. Life. Ins. Co., 648 F. Supp. 2d 591, 606 (D. Vt. 2009); see also Novick v. Metro. Life Ins. Co., 914 F. Supp. 2d 507, 528 (S.D.N.Y. 2012).  Accordingly, plaintiff's claim for LTD Policy benefits will be remanded.

## IV.  CONCLUSION

Rao is entitled to an award of STD Policy benefits.  Given the agreement between the parties, such an award will be offset by the "other income" plaintiff has received.  See Pl.'s Mem. Opp'n, ECF No. 33, 12.  However, plaintiff's claim for LTD Policy benefits must be remanded for proper consideration by LINA in the first instance.

Therefore, it is

ORDERED that

1.  Rao's motion for summary judgment is GRANTED in part and DENIED in part;

2.  LINA's motion for summary judgment is GRANTED in part and DENIED in part;

3.  Rao is entitled to an award of benefits under the STD Policy offset by her qualifying "other income"; and

4. Rao's claim for benefits under the LTD Policy is REMANDED to LINA to process the application and notify plaintiff, in writing, of a decision.

The Clerk of the Court is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

_____
United States District Judge

Dated: April 23, 2015.
       Utica, New York.